**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHRIS WASHINGTON-EL,　　　　　)
　　　　　　　　　　　　　　)　　Civil Action No. 08 - 1688
　　　　　　　　Plaintiff,　　)
　　　　　　　　　　　　　　)　　District Judge Joy Flowers Conti
　　　　v.　　　　　　　　　)　　Chief Magistrate Judge Lisa Pupo Lenihan
　　　　　　　　　　　　　　)
JEFFREY BEARD, *et al.*,　　　　)
　　　　　　　　　　　　　　)　　ECF No. 115
　　　　　　　　Defendants.　)

## REPORT AND RECOMMENDATION

### I.　RECOMMENDATION

For the reasons that follow, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 115) be granted.

### II.　REPORT

Chris Washington-El ("Plaintiff") is a state prisoner committed to the custody of the Pennsylvania Department of Corrections and currently confined at the State Correctional Institution at Huntington ("SCI-Huntington"). He initiated this action in December 2008 by filing a Complaint pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. (ECF No. 4.) His Complaint was directed solely at Defendant Jeffrey Beard, then Secretary of the Pennsylvania Department of Corrections. Defendant Beard moved to dismiss Plaintiff's Complaint for failure to state a claim, and, on September 14, 2009, the Court granted the motion without prejudice to Plaintiff filing an amended complaint. (ECF Nos. 15, 34.)

1

Plaintiff filed an Amended Complaint, which named thirteen new defendants in addition to Defendant Beard. (ECF No. 39.) Soon thereafter, Plaintiff was granted leave to file a second amended complaint naming the same fourteen individuals as defendants, and Plaintiff filed his Second Amended Complaint on February 5, 2010. (ECF No. 43.) Defendants moved to dismiss Plaintiff's Second Amended Complaint, which the Court granted in part and denied in part on March 11, 2011. (ECF Nos. 60, 73.) Several of Plaintiff's claims were dismissed without prejudice to his right to file a third amended complaint.

Plaintiff filed a Third Amended Complaint on May 2, 2011. (ECF No. 75.) Defendants again moved to dismiss and their motion was granted in part and denied in part on March 7, 2012. (ECF Nos. 82, 98.) Two of Plaintiff's claims were dismissed without prejudice to his right to file a fourth amended complaint. However, Plaintiff was warned that this would be his final opportunity to amend.

Plaintiff filed a Fourth Amended Complaint on April 6, 2012. (ECF No. 99.) The parties engaged in discovery and Defendants have filed a Motion for Summary Judgment, which is currently pending before the Court. (ECF No. 115.) Along with the Motion, Defendants also submitted a Brief in Support thereof (ECF No. 117), a Concise Statement of Material Facts (ECF No. 116), and an Appendix (ECF No. 118). Plaintiff filed a Response in Opposition to the Motion for Summary Judgment (ECF No. 121), a Brief in Support thereof (ECF No. 122), a Response to the Concise Statement of Material Facts (ECF No. 123), and an Appendix (ECF No. 124). He was also given another opportunity to file a response in opposition to the summary judgment motion on the issue of due process. Although Plaintiff's response was untimely filed, the Court will nevertheless consider his submissions. (ECF Nos. 139-143, 146.) Defendants' Motion for Summary Judgment is now ripe for review.

## A.  Summary Judgment Standard

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact.  National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52).  If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50.  Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form.  *See*

Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

**B.  Discussion**

In his Fourth Amended Complaint, Plaintiff asserts the following claims: (1) continuous confinement in administrative custody (hereinafter referred to as "administrative custody" or "AC") and on the Restricted Release List (hereinafter referred to as "RRL") in retaliation for filing grievances and lawsuits; (2) lack of a constitutionally meaningful review process for his continuous confinement in AC and on the RRL in violation of procedural due process protections; (3) exacerbation of pre-existing mental health conditions due to prolonged isolation in administrative segregation; (4) conditions of confinement amounting to cruel and unusual punishment; (5) denial of participation in group religious activities; and (6) denial of a Moorish Koran.  Defendants maintain that Plaintiff has failed to exhaust his administrative remedies as to all claims with the exception of his procedural due process claim but they assert that there are no genuine issues as to any material fact with respect to Plaintiff's claim that he was denied procedural due process protections in relation to his extended confinement in AC and on the RRL.

**1.        Exhaustion of administrative remedies**

**a.        Exhaustion Requirement**

Through the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress amended 42 U.S.C. § 1997e(a) to prohibit prisoners from bringing an action with respect to prison conditions pursuant to 42 U.S.C. § 1983 or any other federal law, until such administrative remedies as are available are exhausted.  Specifically, the act provides, in pertinent part, as follows:

4

No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion is required under this provision regardless of the type of relief sought and the type of relief available through administrative procedures. *See* Booth v. Churner, 532 U.S. 731, 741 (2001). In addition, the exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence, including those that involve general circumstances as well as particular episodes. *See* Porter v. Nussle, 524 U.S. 516, 532 (2002). Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies prior to filing the action. *See* Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. Woodford v. Ngo, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" Id. at 93 (quoting Porter, 534 U.S. at 525). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective . . . appeal." Id. at 83; *see also* Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion). Courts have concluded that inmates

who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal courts. *See, e.g.*, Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v. Beard, 183 F. App'x 178 (3d Cir. 2006).

This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. *See* Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000) (Section 1997e(a) only requires that prisoners exhaust such administrative remedies "as are available"). However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis, 49 F. App'x at 368; *see also* Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp, 219 F.3d at 281 (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and correctional officers impeded filing of grievance).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts. Thus, an inmate cannot excuse a failure to timely comply with

these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. <u>Harris</u>, 149 F. App'x at 59. Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. <u>Davis</u>, 49 F. App'x at 368. Thus, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. <u>Casey v. Smith</u>, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. <u>Oliver v. Moore</u>, 145 F. App'x 731 (3d Cir. 2005) (failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

No analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirement, and not the PLRA, that define the boundaries of proper exhaustion." <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007).

**b. Pennsylvania Department of Corrections Grievance and Administrative Remedy Procedures**

The Pennsylvania Department of Corrections ("DOC") has three mutually exclusive procedural avenues for grieving various complaints. Those procedures are outlined in the following policies: (1) the Inmate Discipline Policy, DC-ADM 801; (2) the Administrative Custody Procedures Policy, DC-ADM 802; and (3) the Inmate Grievance System Policy, DC-

ADM 804. These three policies are designed to address specific issues which may arise in connection with an inmate's confinement. One administrative policy may not be substituted for another. Each policy clearly spells out any mandates, or exceptions, with respect to issues that must be addressed, or conversely, excluded from consideration, under the policy.

During the relevant time period at issue herein, inmates challenging their initial or continued confinement in any one of the DOC's Level 5 housing units, (*i.e.*, RHU, SMU or Long Term Segregation Unit), were required to challenge their placement either through DC-ADM 801 or DC-ADM 802, depending upon whether their placement was a form of Administrative Custody ("AC") or Disciplinary Custody ("DC"). Inmates were not permitted to challenge their AC or DC placement through DC-ADM 804, the Inmate Grievance Policy, but they were not precluded from filing grievances pursuant to DC-ADM 804 relating to all other issues impacting their quality of life other than the reasons for their confinement in AC or DC.[1]

Within DC-ADM 804, the Inmate Grievance System Policy, the DOC established a three-step Inmate Grievance System to provide inmates with an avenue to seek review of problems that may arise during the course of confinement. Pursuant to DC-ADM 804, after an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's

---

[1] On June 1, 2011, the Administrative Custody Procedures Policy, DC-ADM 802, was amended to provide that

> [a]ll issues concerning an inmate's placement in AC custody or the duration, conditions or other circumstances of his/her AC custody must be addressed through the procedures set forth in this directive and may not be addressed through the procedures set forth in DC-ADM 801 or DC-ADM 804. An inmate is required to raise any issue concerning the duration or other conditions of his/her AC custody during the regularly scheduled PRC review.

DC-ADM 802 § 2.D.9. This provision was not in effect when Plaintiff was in administrative custody at SCI-Houtzdale from June 2007 through February 2008 and SCI-Fayette from February 2008 through November 2009, at which time DC-ADM 802 had been interpreted to "govern[] only challenges to initial or continued confinement in administrative custody," and not to preclude inmates from seeking administrative relief under DC-ADM 804 regarding other issues. Lyons v. Beard, No. 07-2278, 2009 U.S. Dist. LEXIS 19433, 2009 WL 604139, at *5 (M.D. Pa. Mar. 9, 2009), *aff'd*, 445 F. App'x 461 (3d Cir. 2011).

Grievance Coordinator for initial review. This must occur within fifteen days after the events upon which the claims are based. Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may then appeal to the Facility Manager of the institution.[2] Within fifteen days of an adverse decision by the Facility Manager, an inmate may file a final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). An appeal to final review cannot be completed unless an inmate complies with all established procedures. An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. *See* Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process); Ingram v. SCI Camp Hill, No. 08-23, 2010 U.S. Dist. LEXIS 127124, at *21-25 (M.D. Pa. Dec. 1, 2010) (same).

### c. Analysis

In the instant case, only DC-ADM 802 (Administrative Custody Procedures Policy) and DC-ADM 804 (Inmate Grievance System Policy) are relevant to the exhaustion of remedies issue pending before the Court. Defendants maintain that Plaintiff has failed to exhaust his administrative remedies with respect to all claims which he was required to grieve through the Inmate Grievance System in accordance with DC-ADM 804. They assert that this includes all of his claims with the exception of his challenge to his continued confinement in AC and on the RRL.

Defendants have submitted the declaration of Mr. Michael Bell, an Administrative Officer in the Pennsylvania Department of Correction's Review Office in Camp Hill, Pennsylvania. (ECF No. 118-1 at 39-41.) Mr. Bell states that a review of Plaintiff's DOC

---

[2] The policy was last amended on December 1, 2010. The previous version of the policy, issued on December 1, 2004, only allowed ten working days to appeal an adverse initial review decision to the facility manager.

records reveal that Plaintiff filed a total of eight grievances to final review from June 1, 2007, until December 31, 2009, encompassing the time he was incarcerated at SCI-Houtzdale (June 13, 2007-February 19, 2008) and SCI-Fayette (February 19, 2008-November 17, 2009). Those eight grievances and the subject matter of the grievances are as follows: damage to Plaintiff's typewriter (199509); property missing after prison transfer (200707); denial of telephone call from attorney (211840); denial of sufficiently long visit with attorney (211841); deficient medical care for sinus condition (224333); being labeled a snitch as constituting a tort (241831); malfunctioning computer hindering legal work (259193); and denial of access to paralegals, inmate legal aides, and legal books and permission to correspond with co-defendants (263137). The decisions made at the institutional level were upheld in six grievances: 199509; 200707; 211840; 211841; 224333; and 259193. The final appeal for grievance 241831 was dismissed based on insufficient evidence that Plaintiff was personally affected by a DOC action or policy and the final appeal for grievance 263137 was dismissed for untimely submission.

The record evidence demonstrates that Plaintiff did not exhaust his administrative remedies with respect to any of his claims in which he was required to utilize the Inmate Grievance System in accordance with DC-ADM 804. This includes all of Plaintiff's claims with the exception of his challenge to his continuous confinement in AC and on the RRL.

Plaintiff responds to Defendants' exhaustion argument in several manners. Plaintiff has submitted a copy of the Administrative Custody Procedures Policy, DC-ADM 802, as amended in June 2011, which states that, in addition to their placement and duration in administrative custody, inmates must challenge any issue regarding the condition or circumstances of their administrative custody through DC-ADM 802 and not DC-ADM 804. However, as noted in Footnote 1, this version of the policy was not in effect during the time period relevant to this

action when Plaintiff was in administrative custody at SCI-Houtzdale and SCI-Fayette. Instead, the only exception to DC-ADM 804 occurred when DC-ADM 801 or DC-ADM 802 provided another procedure for seeking the relief requested. As noted in the policy in effect at the time, and interpreted by the federal courts in Pennsylvania, it was only challenges to initial or continued confinement in administrative custody that were governed by DC-ADM 802 and inmates were still permitted to seek administrative relief under DC-ADM 804 concerning all other issues. Indeed, Plaintiff utilized the Inmate Grievance System in accordance with DC-ADM 804 on numerous occasions during the time he was in administrative custody. In response, Plaintiff states that all of his claims currently before the Court were *related* to his administrative custody confinement so that he could not have grieved his issues in accordance with DC-ADM 804, but rather had to do so in accordance with DC-ADM 802. The undersigned is not persuaded by this argument because the DC-ADM 802 policy in effect at the relevant time period provided inmates with an avenue by which to challenge *only* their initial placement and continued confinement in administrative custody and clearly specified that inmates were permitted to use DC-ADM 804 for all other unrelated challenges. Finally, Plaintiff maintains that he was instructed by DOC officials, including a DOC Grievance Coordinator that he could not file a grievance pursuant to DC-ADM 804 on any issue related to his AC confinement. However, the undersigned notes that, according to Plaintiff, this occurred in January 2011, when he was incarcerated at SCI-Frackville. This was over a year after he was transferred from SCI-Fayette in November 2009.[3] Moreover, Plaintiff's argument is rebutted by the fact that he used the Inmate Grievance System, DC-AM 804, to challenge other matters that were related to his

---

[3]     The relevant time period associated with this case is June 2007 through November 2009, when Plaintiff was incarcerated at DOC facilities within the Western District of Pennsylvania.

AC confinement – *i.e.*, denial of a sufficiently long visit with his attorney due to his AC status (211841).

To the extent that this recommended disposition is contrary to Magistrate Judge Bissoon's Report and Recommendation (ECF No. 70) and Judge Conti's Memorandum Order dated March 11, 2011, (ECF No. 73), denying in part Defendants' previous motion to dismiss (ECF No. 60) on the issue of exhaustion of administrative remedies, the undersigned believes that it is not. While Judge Bissoon found Plaintiff's claims to be "inextricably linked to his administrative confinement," she did not recommend that Defendants' motion to dismiss be denied on this issue because Plaintiff was not required to grieve his issues in accordance with DC-ADM 804. Instead, she found that Defendants had not met their burden with respect to this affirmative defense because they had failed to provide any arguments as to why grieving under DC-ADM 802 was improper. For the reasons previously addressed, the undersigned finds that Defendants have cured this deficiency and now met their burden for purposes of summary judgment. Consequently, all such claims should be dismissed for Plaintiff's failure to exhaust pursuant to the PLRA and Defendants' Motion for Summary Judgment should be granted in this regard.[4]

## 2. Procedural Due Process

Plaintiff claims that Defendants violated his due process rights by failing to provide him with "meaningful" periodic review of his AC and RRL status.

### a. Background

---

[4]     Moreover, although Plaintiff availed himself of the procedures outlined in DC-ADM 802, his administrative custody appeals primarily concerned the propriety of his confinement in administrative custody. He did not appeal any issue he raises in his Fourth Amended Complaint other than that concerning the fact of his continued AC placement.

Plaintiff is currently serving an aggregate 15-30 year sentence of incarceration from Philadelphia County for third degree murder, carrying a firearm in public and possessing an instrument of crime.  (ECF No. 118-3 at 24-26.)  He is also being held on a federal detainer pursuant to a life sentence for drug offenses.  (ECF No. 118-3 at 26.)  He entered the DOC on October 19, 1995, and has been the subject of many investigations at the numerous institutions where he has been incarcerated.  Most relevant to the issue before the Court is discussed *infra*.

While Plaintiff was incarcerated at SCI-Graterford, an FBI investigation brought to light that Plaintiff was involved in a conspiracy to smuggle illegal drugs into the facility and also that he had a plan to escape.  (ECF No. 118-3 at 28-29.)  Specifically, in December 2005, Thomas Dohman (then Captain of Internal Security at SCI-Graterford) received information that Plaintiff was participating with several SCI-Graterford staff members in smuggling marijuana into the prison.  (ECF No. 118-3 at 28.)  At that time, Dohman was asked to keep Plaintiff in the general population in order to build a case.  (ECF No. 118-3 at 28.)  However, in February 2006, Plaintiff was later moved to the Restricted Housing Unit ("RHU") in administrative custody pending an investigation after Dohman received information that Plaintiff may have been responsible for an altercation between two inmates.  (ECF No. 118-3 at 29.)  Subsequently, during the investigation, an outside law enforcement agency provided Dohman with information that Plaintiff was planning an escape from the facility utilizing staff and paroled inmates.  (ECF No. 118-3 at 29.)  In response to that information, Dohman decided to have Plaintiff remain in administrative custody in order to prevent his escape and to prevent him from trafficking drugs

into the facility.[5]  (ECF No. 118-3 at 29.)   In June 2007, Plaintiff was transferred from SCI-Graterford to SCI-Houtzdale.  (ECF No. 118-3 at 29.)

In September 2007, the information that Dohman had received regarding Plaintiff's drug activity and escape plan resulted in federal indictments against four guards who worked at SCI-Graterford and one non-guard.  (ECF No. 118-3 at 29.)   According to one of the indictments, Plaintiff (identified as "C.W.") was known to be integrally involved in illicit drug activity and an escape attempt.  (ECF No. 118-3 at 32-41.)  The investigation resulting in the indictments of the employees was further elucidated by a press release from the Department of Justice dated September 21, 2007, which indicates that, in addition to drugs, the plot involved smuggling cellular devices into the prison.  (ECF No. 118-3 at 43.)

While at SCI-Houtzdale, Plaintiff was overheard talking to an inmate in the mini law library regarding the best place to hide a vehicle in the area and where they could get fake passports and ID cards.  (ECF No. 118-3 at 48.)   In December 2007, Defendant George N. Patrick, Superintendent of SCI-Houtzdale, recommended Plaintiff be placed on the RRL and transferred to a Level 4 facility due to the security concerns he presented.  (ECF No. 118-3 at 48.)

### b.    Law

"The core of due process is the right to notice and a meaningful opportunity to be heard." LaChance v. Erickson, 522 U.S. 262, 266 (1998).  In analyzing any procedural due process claim of this type, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment."   Shoats v.

---

[5]     According to the memorandum issued by Defendant Patrick on December 14, 2007, Plaintiff had allegedly been involved in a prior escape attempt.  Plaintiff received an Administrative Transfer on July 21, 1999 from SCI-Smithfield to SCI-Pittsburgh due to information received from the FBI regarding an escape attempt involving associates of his who were to assist him in escaping from DOC custody.  (ECF No. 118-3 at 47.)

Horn, 213 F.3d 140, 143 (3d Cir. 2000) (citing <u>Fuentes v. Shevin</u>, 407 U.S. 67 (1972)).  Once it is determined that a property or liberty interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it.  <u>Id</u>. (citing <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)).

The threshold question presented by Plaintiff's claim is whether Defendants' actions impacted a constitutionally protected liberty interest.  Normally, transfer from one level of custody in a prison to another does not impinge a constitutionally protected interest.  <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005) (no liberty interest "in avoiding transfer to more adverse conditions of confinement"); <u>Hewitt v. Helms</u>, 459 U.S. 460, 468 (1983) (finding that "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence"); <u>Meachum v. Fano</u>, 427 U.S. 215, 224 (1976) (holding that there is no liberty interest invoked "when a prisoner is transferred to the institution with the more severe rules.").  Moreover, the Due Process Clause does not create an inherent liberty interest to remain free from administrative segregation.  *See*, *e.g.*, <u>Hewitt</u>, 459 U.S. at 468; <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974); <u>Montayne v. Haymes</u>, 427 U.S. 236, 242 (1976); <u>Sheehan v. Beyer</u>, 51 F.3d 1170, 1175 (3d Cir. 1995); <u>Layton v. Beyer</u>, 953 F.2d 839, 845 (3d Cir. 1992).  However, the Supreme Court has held that prison conditions deprive a prisoner of a state created liberty interest that is protected by due process guarantees when they result in "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Sandin v. Conner</u>, 515 U.S. 472, 483 (1995).  The baseline for determining what is "atypical and significant hardship…in relation to the ordinary incidents of prison life" is ascertained by what a sentenced inmate may reasonably

expect to encounter as a result of his or her conviction in accordance with due process of law. Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997).

### c.    Analysis

In his lengthy response in opposition to Defendants' Motion for Summary Judgment, Plaintiff makes numerous complaints, most importantly that the periodic reviews he received were a "sham" and merely "perfunctory." Although not an issue in this litigation, he asserts that his initial placement in the RHU by Dohman while at SCI-Graterford was in retaliation for, among other things, filing a grievance, and he asserts that he was denied due process during his 17-month stay in administrative custody at that facility prior to being transferred to SCI-Houtzdale in June of 2007.[6] Plaintiff complains that, following his transfer, there was no justification for his continued confinement in administrative custody since he was never charged with, or received a misconduct or rule violation, for any planned or attempted escape. Despite this, he complains that his periodic reviews consisted of the PRC simply "walking-by" his cell, most often times in a rush, without his file to reference and without taking written record of the meeting. Although not clear from the record, Plaintiff was presumably placed on the RRL in January 2008 after Defendant Patrick, Superintendent of SCI-Houtzdale, issued a memo to Shirley Moore, then Regional Deputy Secretary, recommending his placement on the list and transfer to another facility due to the belief that Plaintiff would continue to be a "problematic inmate" while in custody. Plaintiff states that he was never provided with the rationale for his placement on the RRL and he did not receive a copy of this memo until almost five years later when it was provided to him during discovery in this litigation. Finally, he complains that after

---

[6] Plaintiff's initial placement and 17-month long confinement in the RHU at SCI-Graterford were the subject of a separate lawsuit filed in the Eastern District of Pennsylvania. *See* Washington-El v. Diguglielmo, No. 06-cv-4517 (E.D. Pa.), subsequent appeal at 419 F. App'x 275 (3d Cir. 2011).

he was placed on the RRL, his periodic reviews essentially became meaningless since it was already determined that he was to serve year-long terms in administrative segregation without being considered for placement in general population until his removal from the list. Plaintiff was removed from the RRL and returned to general population on January 7, 2013, after serving an aggregate total of approximately seven years in restricted housing. *See* ECF No. 140.

Assuming that Plaintiff suffered a deprivation of a protected liberty interest by virtue of his extended confinement in AC and on the RRL for the two to two-and-one-half year period relevant in this case, this merely begs the question of what process was constitutionally "due." It is well settled in Pennsylvania that periodic review of inmates indefinitely confined in administrative confinement comports with due process requirements. Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000);[7] Delker v. McCullough, 103 F. App'x 694 (3d Cir. 2004); McKeithan v. Beard, 322 F. App'x 194, 199 (3d Cir. 2009). The Third Circuit has repeatedly affirmed the holding in Shoats that post-transfer periodic review comports with due process requirements for prisoners serving lengthy sentences who are housed in restricted administrative custody for indefinite periods of time. *See*, *e.g.*, Gans v. Rozum, 267 F. App'x 178, 180-81 (3d Cir. 2008) (prisoner in administrative custody for eleven years); Williams v. Sebek, 299 F. App'x 104, 107 (3d Cir. 2008) (holding that inmate's continued confinement in administrative custody for five and one-half years did not require a remedy because the record showed that he was receiving the required periodic reviews of his status by the program review committee); Brown v. D.O.C. Pa., 265 F. App'x 107, 110 (3d Cir. 2008) (same); Bowen v. Ryan, 248 F. App'x 302, 304 (3d Cir.

---

[7] In Shoats, a prisoner had been placed in administrative custody and was maintained there is virtual isolation for eight years. The Third Circuit noted that such a long-term placement clearly gave rise to procedural due process protections under the analysis mandated by Sandin. Nonetheless, relying on Hewitt, the Court found that informal, periodic review of the prisoner's administrative custody status satisfies the requirements of due process. Shoats, 213 F.3d at 147.

2007) (prisoner in administrative custody status for twenty years on restricted release status). However, such periodic review must provide a meaningful, and not merely technical, opportunity to be heard. *See* <u>Sourbeer v. Robinson</u>, 791 F.2d 1094, 1101 (3d Cir. 1986) (Due process violation where officials applied justifications for segregation in "rote fashion").

As an initial matter, it appears that Plaintiff is complaining that he was deprived of due process in connection with the decision to place him on the RRL. However, Plaintiff is mistaken insofar as he assumes that his placement on the RRL implicated a constitutionally protected due process right. In fact, this issue has been previously addressed and dismissed in this case. (ECF No. 70 at 17.) Per DOC policy, the RRL is simply

> [a] list of inmates who are restricted from release from AC status without the prior approval of the Secretary [or his] designee. An inmate may be placed on this list when he/she poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern.

(ECF No. 118-1 at 36.) As one court has explained,

> [Both] RRL and non-RRL inmates have their custody status periodically reviewed by the [Program Review Committee]. Non-RRL inmates can be released into general population by the PRC or Superintendent. See DC-ADM 802, Section 4(A). Release of an RRL inmate into general population, however, requires the approval of the Secretary of Correction or his or her designee, though the PRC may recommend release. See id. In all other respects, RRL inmates are treated identically to their non-RRL counterparts on AC-status.

<u>Leaphart v. Palakovich</u>, No. 3:11-CV-1333, 2012 U.S. Dist. LEXIS 6918, 2012 WL 175426, at *3 (M.D. Pa. Jan. 20, 2012). Thus, placement on the RRL merely adds another layer of review relative to the decision to release an inmate from administrative custody back to general population; it does not involve any added deprivation of liberty as to which due process rights attach. *See* <u>Bowen</u>, 248 F. App'x at 304 (affirming dismissal of prisoner's claim that he was placed on the RRL without due process because "[p]lacement on the List did not deprive Bowen

of his liberty, privileges, or any other constitutionally protected liberty interest"); Carter v. Beard, 2012 U.S. Dist. LEXIS 57209, 2012 WL 1414446, at *3 (M.D. Pa. April 24, 2012) (noting that the "Third Circuit has held . . . that placement on the RRL does not deprive an inmate of a liberty interest triggering due-process protection") (citing Bowen, supra, at 304); Leaphart, supra, 2012 U.S. Dist. LEXIS 6918, [WL], at *3 ("Plaintiff's placement on RRL did not violate his due process rights since it did not impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."). Accordingly, even if Plaintiff never received a separate notice and hearing relative to his placement on the RRL, no due process violation occurred with respect to that particular administrative decision.

Plaintiff makes the argument that his confinement in AC and on the RRL was without valid justification because he never received a misconduct or was criminally charged with any planned or attempted escape nor was he a problematic inmate as alleged. However, the fact that Plaintiff may have never been disciplined for any such wrongdoing does not compel the conclusion that there was no valid reason for his continuous confinement in AC and on the RRL. As the Third Circuit noted in Shoats, a prisoner may be placed in administrative confinement, even where no misconduct has occurred, and all that is required is that the prison provide an opportunity for the prisoner to contest the "purely subjective evaluation" of his dangerousness. Shoats, 213 F.3d at 147. In the seminal case of Hewitt v. Helms, 459 U.S. 460 (1983), the Supreme Court emphasized that

> [i]n the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may sufficient to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior.

*Id*. at 474 (internal citations omitted). Prison officials at SCI-Houtzdale and SCI-Fayette clearly disagreed with Plaintiff's view that his ongoing AC and RRL status was without reason, feeling instead that they were justified by continuing security concerns, namely that he was an escape risk. This Court is not in a position to second-guess that penological judgment. *See* Stevenson v. Carroll, 495 F.3d 62, 71 (3d Cir. 2007) ("[W]e are unwilling to substitute our judgment on these difficult and sensitive matters of institutional administration and security for that of the persons who are actually charged with and trained in the running of such facilities.") (quoting Block v. Rutherford, 468 U.S. 576, 588 (1984)). The record clearly demonstrates that Plaintiff was an escape risk. Even though Plaintiff may not have received misconducts or been criminally charged for such behavior, case law is clear that prison officials may consider an inmate's past conduct or generally volatile nature in making judgments about whether they pose an ongoing security risk. *See* Shoats, 213 F.3d at 146 (noting that "predictions of likely future behavior based on generally volatile criminal character have been upheld by the Supreme Court" and thus, an inmate "could conceivably be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct").

Plaintiff does not dispute that he received the requisite periodic reviews with regard to his continuous AC confinement; rather, he claims that his reviews were inadequate and became meaningless after he was placed on the RRL. This argument is unavailing. Defendants have submitted copies of the reports from all periodic reviews Plaintiff received during the relevant time period in this case, June 2007, through November 2009. These reviews demonstrate that Plaintiff was informed of the reasons for his AC and RRL status. Plaintiff's first review at SCI-Houtzdale occurred on June 21, 2007. (ECF No. 118-3 at 2.) Plaintiff inquired about his AC status and was informed that he was placed on AC status because he was an escape risk. (ECF

No. 118-3 at 2.)  On September 21, 2007, Plaintiff received a report informing him that he was the subject of an investigation and that he would be held on AC status pending the outcome of the investigation.  (ECF No. 118-3 at 3.)  A week later, he received his periodic review and was informed that he was not currently eligible for placement in the general population because he was under investigative status.  (ECF No. 118-3 at 4.)  On October 26, 2007, Plaintiff was informed that the investigation had concluded and that the PRC had determined that he was an escape risk such that he could not be placed in general population.  (ECF No. 118-3 at 5.)  Thereafter, Plaintiff received periodic reviews until his transfer to SCI-Fayette in February 2008, and again until his transfer to SCI-Frackville in November 2009.  (ECF No. 118-3 at 8, 11, 12, 16, 19, 20, 21, 22.)  In each review, Plaintiff was given opportunities to speak with members of the PRC about the reasons for his AC and RRL status, and he did, in fact, discuss these issues with them on multiple occasions.  Moreover, he had the opportunity to appeal their decisions all the way to the DOC's Central Office.  Plaintiff's complaints that his reviews were "rushed" and took place at his cell rather than in a hearing room are of no constitutional significance.

Finally, Plaintiff's argument that his periodic reviews were meaningless after he was placed on the RRL is also unavailing.  Plaintiff complains that he was placed on the RRL for a one-year minimum indefinite isolation sentence on or about January 2, 2008, and that he was given year-long terms on the RRL thereafter, making his 90-day reviews of his status meaningless.  There is no support for Plaintiff's argument in the record with the exception of Defendant Patrick's response to Plaintiff's request to staff member dated January 3, 2008, wherein he writes that Plaintiff would not be considered for placement in the general population in the "1-year term" due to his placement on the RRL.  (ECF No. 68-2 at 4.)  The undersigned has found no other evidence in the record or in the DOC's published policies and procedures to

support the assumption that inmates are placed on the RRL for year terms and cannot be considered for placement in general population during that time. Nevertheless, even if it is so, this does not compel the conclusion that Plaintiff's periodic reviews were rendered meaningless. Under the terms of DC-ADM 802, the regulation that governs release from administrative custody, "the PRC may make a recommendation to the Facility manager if it is believed that an inmate on the Restrict Release List could be safely released to general population." (ECF No. 118-1 at 35.) In that sense, an inmate on the RRL could present evidence at his PRC hearing that would help cause a change in his status even if it could not take place for one year. Moreover, a one year stay in administrative custody in restricted housing does not constitute an "atypical and significant . . . hardship in relation to the ordinary incidents of prison life" sufficient to deprive Plaintiff of a protected liberty interest. *See* Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997) (so holding with respect to 15-month stay in administrative custody in the restricted housing unit); Washington-El v. Diguglielmo, 419 F. App'x 275, 278 (3d Cir. 2011) (Plaintiff's 17-month stay in administrative custody in the RHU at SCI-Graterford not sufficient to deprive him of a protected liberty interest to implicate due process concerns).

Upon extensive review of the record, including the parties' submissions in support and in opposition to summary judgment, the undersigned finds that Defendants have met their burden for issuance of summary judgment in their favor. Accordingly, their motion should be granted.

## III.   CONCLUSION

For the reasons set forth above, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 115) be granted.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen

(14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated: February 26, 2013

_____
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Chris Washington-El
CW-2075
1100 Pike Street
Huntingdon, PA 16654
*Via U.S. Mail*

Counsel of Record
*Via ECF Electronic Mail*